# CASES AT LAW

DETERMINED IN THE

# COURT OF ERRORS AND APPEALS

OF THE

# STATE OF NEW JERSEY,

NOVEMBER TERM, 1886.

———————

THE STATE BOARD OF ASSESSORS v. THE MORRIS AND ESSEX RAILROAD COMPANY AND THE DELAWARE, LACKAWANNA AND WESTERN RAILROAD COMPANY.

1. The decisions of the Supreme Court of the United States with respect to the interpretation and effect of contracts furnish binding rules of construction in cases within the provision of the federal constitution prohibiting the passing of any law by the states impairing the obligation of contracts.

2. The legislature may grant to a corporation two classes of rights and franchises, those over which it retains control to modify or withdraw by alteration or repeal, and those which are embodied in a contract, and hence incapable of alteration or repeal; under such circumstances the legislative control by alteration or repeal, is exercisable only upon the charter rights and privileges over which such power is retained.

3. In the grant to an existing corporation of additional franchises, there is no new creation of a corporate body. The corporation to which, from time to time, additional franchises are granted, is still the same corporate body—the same legal entity, under one organization and one management, and its franchises are a unit. The legislature may make an additional grant of franchises or take away some of the franchises previously conferred, but the ideal artificial person originally

created will remain with increased or diminished powers until it expires by its own limitation, or is extinguished by legislative authority.

4. The legislature may grant to a foreign corporation power to exercise its franchises or independent powers in the nature of corporate franchises within the state, without making it a domestic corporation. In such cases the foreign corporation will take, under legislative sanction, those rights only which are within the expressed terms of the grant.

5. Immunity from taxation granted to a corporation is a personal privilege, incapable of being transferred to another corporation without express legislative sanction. It is a privilege entirely distinct from the franchises of the corporation, and will not pass by a transfer under legislative authority empowering the corporation to assign and transfer its franchises and property.

6. But where the enabling act empowering a corporation to transfer its property and franchises, included its privileges and immunities in the enumeration of the powers granted, immunity from taxation possessed by such a corporation will accompany the property and franchises, and such property and franchises will continue to be held under the immunity from taxation which was possessed by the original corporation, unless a constitutional provision against exemption from taxation has interdicted it, or the contract of exemption has, in the altered condition assumed by the corporation, become impossible of performance.

7. By the decision of the United States Supreme Court, in *New Jersey* v. *Yard*, 95 *U. S.* 104, it was established that the supplement to the charter of the Morris and Essex Railroad Company of March 23d, 1865, which enacted that the tax of one-half of one per cent. upon the cost of the company's road should be in lieu and satisfaction of all other taxation or imposition whatsoever by or under the authority of this state, or any law thereof, created a contract with the company on the subject of taxation. *Held*—

1. That the immunity from other taxation granted by this act applies to the taxation provided for by the act for the taxation of railroad and canal property, approved April 10th, 1884.

2. That the contract on the subject of taxation, contained in the act of 1865, is a contract with the company as a corporation, and personal to it in its corporate capacity, and also prospective in its operation, and applicable to taxation, from time to time, as taxes are laid ; that the contract extends to all property owned by the company suitable and proper to carry into execution powers it then possessed, or which it acquired by supplements to its charter subsequently passed; that the cost of works constructed under powers granted after the act of 1865, and of property acquired for that purpose, is included in the estimation of the cost of the road on which the annual tax of one-half

of one per cent. is to be assessed, and that such taxation is in lieu and satisfaction of all other taxation.

3. That the operation of the act of 1865 is not controlled or qualified by the fact that the supplements to the company's charter after that date are repealable.

8. The Morris and Essex Railroad Company, by a lease dated December 10th, 1868, demised and leased its railroad and property, and also all and singular the franchises, immunities, rights, powers and privileges which had been or might thereafter be granted to, or conferred upon, or which might be used or exercised by it, to the Delaware, Lackawanna and Western Railroad Company, a foreign corporation, for and during the full term of the continuance of the lessor's charter. By an act passed February 9th, 1869, the legislature validated and confirmed the lease, and enacted that the Delaware, Lackawanna and Western Railroad Company be authorized and empowered to have, hold, use, enjoy, possess and exercise " all and singular the property, things, franchises, immunities, rights, powers and privileges " by said lease granted. *Held*—

1. That by force of the lease and the validating act the immunity from taxation, possessed by the Morris and Essex Railroad Company, was conferred upon the Delaware, Lackawanna and Western Railroad Company.

2. That immunity from taxation was granted to the latter company, not as a corporation, but as lessee, and with respect to the use, possession and enjoyment of the property, things, franchises, rights and powers " by said lease and contract leased and demised" to it, and is therefore limited to such rights and property as it took and holds as lessee, and upon a construction of the lease *strictissimi juris.*

3. That the grant and demise and the validating act apply only to such franchises as the state had conferred, or might thereafter confer, *nominatim*, upon the Morris and Essex Railroad Company, and with respect to those franchises and the property acquired under them immunity from taxation was granted. But with respect to powers granted to railroad corporations by general laws, property acquired under those acts—not being property taken and held under the lease—is not within the validating act, and consequently immunity from taxation thereon is not granted by that act.

4. That rolling stock, equipment and other property used by the lessee company in operating the railroad, and in its business connected therewith, not taken and held by it under the lease and in the capacity of lessee, is not within the grant of immunity from taxation.

9. The state may alter modes of procedure which do not affect the substantial rights of parties under the contract, and a change in the method of ascertaining the cost of the company's road, for the purpose of taxation thereon under the act of 1865 would not impair the obliga-

tion of the contract.   This matter is wholly within legislative discretion.

On error to the Supreme Court.

For the plaintiff in error, *J. P. Stockton, Attorney-General,* and *Barker Gummere.*

*Contra, J. D. Bedle.*

The opinion of the court was delivered by

DEPUE, J.   The taxes in controversy were laid upon the Morris and Essex Railroad Company for its property, real and personal, and its franchises, under the act for the taxation of railroad and canal property, approved April 10th, 1884.   *Pamph L., p.* 142.   By the judgment of this court at the last term, the validity of the mode of taxation adopted by the act of 1884 was established.*   The subject for consideration at this time is the effect of the contract of the Morris and Essex Railroad Company with the state, with respect to taxation, upon the taxation in question.

The fifteenth section of the act incorporating the company, passed January 27th, 1835, provided " that as soon as the railroad, with its appendages, shall be finished so as to be used, the president and treasurer of the said company shall file, under oath and affirmation, a statement of the amount of the costs of said road, including all expenses, in the office of the secretary of state ; and annually thereafter the president and treasurer of the said company shall, under oath or affirmation, make a statement to the legislature of this state of the proceeds of said road, and as soon as the net proceeds of said railroad shall amount to seven per centum upon its cost, the said corporation shall pay to the treasurer of this state a tax of one half of one per centum on the cost of said road, to be paid annually thereafter on the first Monday of January of each year ; provided, that no other tax or impost shall be levied or assessed upon the said company."

---

* *State Board of Assessors* v. *Central R. R. Co.,* 19 *Vroom* 146.

The railroad the company was authorized to build by the original act of incorporation was from Morristown to some intersection with the New Jersey Railroad at Newark or Elizabeth, or between those places. By several supplements passed prior to the year 1865, the company was authorized to make extensions to its railroad which, when constructed, would make a continuous line of railroad between Hoboken and some point on the Delaware river at or near Phillipsburg.

In 1865, by another supplement to its charter, approved March 23d, 1865, the company was authorized to construct what is known as the Boonton branch. By the third section of that act it was enacted "that the tax of one-half of one per cent. provided, by their said original act of incorporation, to be paid by the said company to the state whenever the net earnings of the said company amount to seven per cent. upon the cost of the road, shall be paid at the expiration of one year from the time when the road of the said company shall be open and in use to Phillipsburg, and annually thereafter, which tax shall be in lieu and satisfaction of all other taxation or imposition whatsoever by or under the authority of this state or any law thereof; provided that this section shall not go into effect or be binding upon the said company until the said company, by an instrument duly executed under its corporate seal and filed in the office of the secretary of state, shall have signified its assent hereto, which said assent shall be signified within sixty days after the passage of this act, or this act shall be void."

The company, by an assent duly executed under its corporate seal, dated April 17th, and filed April 24th, 1865, agreed to be subject to the provisions of the said act and to pay the tax therein named as therein specified.

In 1874, the Supreme Court of this state held that no contract on the subject of taxation was created by the act of 1865; that that section was repealable in virtue either of the reserved power of alteration and repeal in the company's original charter, or of the sixth section of the General Corporation act of 1846 (*Nix. Dig.*, *p.* 168), and that therefore the state

might subject the company or its property to other taxation than that designated in the act of 1865. *State, Morris and Essex R. R. Co., pros.,* v. *Commissioner of Railroad Taxation,* 8 *Vroom* 228. That decision was affirmed by this court (9 *Vroom* 472), but was reversed by the Supreme Court of the United States, and by that court it was held that the act of 1865 and the acceptance of it by the company constituted a contract on the subject of taxation which could not be impaired by any subsequent legislation. *New Jersey* v. *Yard,* 95 *U. S.* 104. After the judgment was pronounced, the court denied an application for a rehearing, thus making the judgment a finality, and so we must accept it. The decision must stand as a warning of the danger of indiscreet legislation, from the consequences of which the judiciary is unable to afford relief. It must be assumed, therefore, in the state courts, as established that any tax assessed against the Morris and Essex Railroad Company, in violation of the provisions of the act of 1865, is illegal.

In 1868, the Morris and Essex Railroad Company demised and leased its property and franchises to the Delaware, Lackawanna and Western Railroad Company, for the full term of the continuance of its charter, and of all renewals thereof that might thereafter be made or granted. This lease and transfer were validated by an act of the legislature approved February 9th, 1869 (*Pamph. L., p.* 28), and since that time the Delaware, Lackawanna and Western Railroad Company has been in the possession, enjoyment and use of the property and franchises of the Morris and Essex Railroad Company.

The contention on the part of the state is that the contract between the Morris and Essex Railroad Company and the state, on the subject of taxation, did not pass to the Delaware, Lackawanna and Western Railroad Company, and that the property and franchises in question are taxable as against the latter company without regard to the provisions of the act of 1865. The Delaware, Lackawanna and Western Company has become a party to this suit. If the property on which the taxes were laid is in fact liable to such taxation, the assess-

ment may be corrected and the tax be laid upon the Delaware, Lackawanna and Western Railroad Company, in virtue of the general act concerning taxes of March 23d, 1881 (*Pamph. L.*, *p.* 194), or the sixteenth section of the act of 1884.

The contract between the Morris and Essex Railroad Company and the state is a contract for the commutation of taxes by the payment, annually, of a certain percentage upon the cost of its railroad, in lieu of other taxation. The legal effect of the contract is to secure to the company immunity from other taxation in consideration of the prescribed tax to be paid. Immunity from taxation granted to a corporation is a personal privilege incapable of being transferred to another corporation without express legislative sanction. It is a privilege of a personal character, entirely distinct from the franchises of the corporation, and will not pass by a transfer under legislative authority empowering the corporation to assign and transfer its franchises and property. In *Morgan* v. *Louisiana*, 93 *U. S.* 217, 223, Mr. Justice Field said: "The franchises of a railroad corporation are rights or privileges which are essential to the operation of the corporation, and without which its road and works would be of little value—such as the franchise to run cars, to take tolls, to appropriate earth and gravel for the bed of its road, or water for its engines, and the like. They are positive rights or privileges, without the possession of which the road of the company could not be successfully worked. Immunity from taxation is not one of them. The former, *i. e.*, the franchises, may be conveyed to a purchaser of the road as part of the property of the company; the latter, *i. e.*, immunity from taxation, is personal, and incapable of transfer without express statutory direction." In *Memphis R. R. Co.* v. *Commissioners*, 112 *U. S.* 609, 617, Mr. Justice Matthews said: "The exemption from taxation must be construed to have been the personal privilege of the very corporation specifically referred to, and to have perished with that, unless the express and clear intention of the law requires the exemption to pass as a continuing franchise to a successor. This salutary rule of interpretation is founded

upon an obvious public policy, which regards such exemptions as in derogation of the sovereign authority and of common right, and therefore not to be extended beyond the exact and express requirement of the grant, construed *strictissimi juris.*"

It has accordingly been held that immunity from taxation upon the property of a railroad company will not pass to a purchaser under a decree founded upon a mortgage which in terms covers only the property and franchises of the company, or under process upon a money judgment, nor upon a sale in foreclosure of a statutory lien on the company's property. *Morgan* v. *Louisiana,* 93 *U. S.* 217; *Wilson* v. *Gaines,* 103 *Id.* 417–421; *Chesapeake and Ohio R. R. Co.* v. *Miller,* 114 *Id.* 176. In such cases nothing will pass but the property of the company and such franchises as are necessary to the operation of the company, without which its road and works would be of little value, and in the hands of purchasers the property will be subject to taxation.

But the same court has repeatedly held that when the act of the legislature empowering a corporation to transfer its property and franchises included its privileges and immunities in the enumeration of the powers granted, immunity from taxation possessed by such a corporation will accompany the property and franchises, and such property and franchises will continue to be held under the immunity from taxation which was possessed by the original corporation.

In *Tomlinson* v. *Branch,* 15 *Wall.* 460, a railroad company having in its charter such exemption for a limited period was afterwards merged in another company under an act of the legislature which provided that by such merger the latter company should be invested with "all the rights, privileges and property" of the former company. It was held that the exemption and its limitation accompanied the property, and that the latter company was subject to taxation with respect to such property in the manner prescribed by the charter of the former company. In *Humphreys* v. *Peguis,* 16 *Wall.* 244, a railroad company was incorporated in 1851. In 1855, the legislature, by a supplement to its charter, provided that the

company should be exempt from all taxation during the continuance of its charter. In 1863, an act was passed conferring upon another company, which had been incorporated in 1849, all the rights, powers and privileges granted by the charter of the first-named road." It was held that by this legislation an exemption fro n taxation was granted, on the ground that immunity from taxation was embraced in the grant of "privileges." In *Trask* v. *Maguire*, 18 *Wall.* 391, a railroad company by its charter had an irrepealable grant of perpetual exemption from state and county taxes. An act of the legislature empowered the company to mortgage its road and appurtenances to secure a loan made by the state on the company's bonds, and authorized the governor, in default of payment of interest or principal, to sell the road and its appurtenances to the highest bidder, or to buy in for the benefit of the state, subject to such disposition in respect to the road or its proceeds as the legislature might thereafter direct. The road was afterwards sold, with all its rights and franchises, under the act, for default of payment of interest, and was bid in by the state. By this sale the company's exemption from taxation was extinguished. Subsequently the road and its appurtenances and all its franchises were resold by the state to McKay, Vogel and Simmons, who conveyed the same to one Allen, who with others became incorporated under the name of the St. Louis and Iron Mountain Railroad Company. The act authorizing the resale provided that the purchasers of the road should have "all the rights, franchises, privileges and immunities" which were enjoyed by the defaulting company under its charter. The court (Mr. Justice Field delivering the opinion) held that as a matter of construction the new company, under the designation of "rights, franchises, privileges and immunities," acquired all the immunity from taxation which the original company had possessed; but the decision was against such a right in the company, for the reason that prior to the resale a constitutional provision had been adopted forbidding the legislature to pass any special law exempting the property of any person or corporation from taxa-

tion—a provision the court construed as an interdict of the renewal of an exemption from taxation as well as of the creation of one in an original form.  In *Louisville and Nashville R. R. Co.* v. *Palmer*, 109 *U. S.* 244, the Pensacola and Louisville Railroad Company, a corporation of the State of Florida, incorporated in 1868, was re-organized under an act of February 4th, 1872.  By the eighteenth section of the re-organizing act an exemption from taxation was granted to the company.  The Pensacola Railroad Company was incorporated by an act passed February 27th, 1877.  The second section of the act empowered the company to acquire by purchase an assignment of " all the property, rights, franchises, privileges and immunities " of the Pensacola and Louisville Railroad Company, and enacted that upon the completion of said purchase the Pensacola Railroad Company should be " fully invested with and entitled to all the said property, rights, franchises, privileges and immunities of the Pensacola and Louisville Railroad Company, as though the same were originally granted to or acquired by the Pensacola Railroad Company."  Among the issues raised was the question whether the language of the second section of the act of February 27th, 1877, was explicit enough to vest in the Pensacola Railroad Company the immunity from taxation granted to the Pensacola and Louisville Railroad Company by the eighteenth section of its charter.  The court resolved this question in the affirmative.  Mr. Justice Matthews, delivering the opinion, after quoting the section, said : " It is claimed that this language is broad enough to cover the assignment and transfer of the immunity from taxation granted to the Pensacola and Louisville Railroad Company by the eighteenth section of its charter. And we are of this opinion.  The language is comprehensive and unequivocal, and the word " immunity " is apt to describe the exemption claimed.  It admits of no doubt, we think, if the Pensacola and Louisville Railroad Company were entitled to this exemption, and if the legislative grant of authority to make and accept this assignment of it were valid and effective, that the right to be exempt from taxation according to its

terms passed to the Pensacola Railroad Company." The right failed as it did in Trask v. Maguire, for the reason that a constitutional limitation which interdicted exemptions from taxation had intervened when the act of 1877 was passed.

The rule of construction so clearly expressed in the foregoing cases is not impugned in *Railroad Co.* v. *Maine*, 96 *U. S.* 499, or in *Chesapeake and Ohio Railway Co.* v. *Miller*, 114 *Id.* 176. The facts upon which the first of these cases was decided were as follows: The Maine Central Railroad Company was formed by the consolidation of two distinct corporations, each of which had constructed its railroad. Each of these companies had a provision in its charter that whenever the annual net income of the company amounted to ten per cent. upon the cost of the road and " its appendages and incidental expenses," the directors should make a special report of the fact to the legislature, " from and after which time " one moiety or such other portion as the legislature might determine, of the net income accruing thereafter above the ten per cent. first to be paid to the stockholders should annually be paid, as a tax, into the treasury of the state, with further provisions that no other tax should ever be levied or assessed on the corporation or any of its privileges or franchises. The act under which this consolidation was effected provided that the new corporation thus formed should have " all the powers, privileges and immunities " possessed by each of the corporations entering into the consolidation. Mr. Justice Field, in delivering the opinion of the court, commented upon the peculiar features of the charter provisions of the two distinct corporations brought into the consolidation—that in each case the power of the legislature to appropriate any portion of the income of either road was conditioned upon the net income exceeding ten per cent. upon the cost of the road, " its appendages and incidental expenses." He said: " The conditions upon which the limitation of taxation was prescribed could be performed only while the companies were distinct corporations operating separate lines. Those companies only were required to keep an account of their disbursements, expenditures and

receipts for the inspection of the governor and council and committees of the legislature. Their treasurers only were bound to render to the legislature, at the expiration of every year, exhibits, under oath, of the net profits of their roads. Their directors only were called upon to make a special report to the legislature whenever their annual income amounted to ten per cent. upon the cost and expense of their roads. It was only upon such report that the legislature was to determine the portion of the income which should be received in lieu of other taxes." He added : " The new company was subject to no such duty of keeping an account of the expenditures and receipts of the original lines. Its directors were not called upon to make any report as to the income of such lines ; nor was its treasurer required to make any annual exhibit of the net profits derived from them. The assets of all the companies were intermingled, and continuous trains were run over the whole length of the several roads. It would have been impossible to show what would have been the profits of each road without the consolidation." The learned judge then stated the ground of decision in these words : " The consolidation of the original companies was a voluntary proceeding on their part. The law made it dependent upon their agreement, and that law was presumably passed upon their request, as they are named in it, and they acted under it. Having thus disabled themselves from a compliance with the conditions upon the performance of which the amount to be paid as a tax to the state could be ascertained, they must be considered as having waived the exemption dependent upon such performance. Their exemption was qualified by their duties and dependent upon them. They incapacitated themselves from the performance of those duties by a proceeding which they supposed would give them greater advantages than they possessed in their separate condition, and they thus lost their exemption."

Chesapeake and Ohio Railway Co. v. Miller was decided upon these facts : The Covington and Ohio Railroad Company was incorporated March 1st, 1866. By the seventh section of its

charter it was provided that no taxation upon the property of the said company should be imposed by the state until "the profits of the said company should amount to ten per cent. on the capital of the company." On the 26th of February, 1877, an act was passed which authorized the consolidation of that company with one or more of several other railroad companies, the consolidated company to be known as the Chesapeake and Ohio Railroad Company, and to be invested with "all the rights, privileges, franchises and property which had been vested in either company prior to the act of consolidation." The property and works of the new company were sold under foreclosure of a deed of trust by way of mortgage. The act authorizing the sale enacted that upon conveyance to the purchaser the original corporation should be dissolved; that the purchaser should become a new corporation in any name set forth in a certificate to be filed, and that the new corporation should succeed to all the franchises, rights and privileges of the former company. Under this statute the purchasers organized under the corporate name of the Chesapeake and Ohio Railway Company. The question before the court was whether the new corporation succeeded to the provision for taxation contained in the charter of the old company. The court decided the question in the negative. The exemption from taxation in the charter of the first company was also peculiar. It ceased when the profits of the original company realized from its business reached a certain percentage on the capital stock of that company. It had no application to the new business and the additional capital stock brought into it by the other companies, or the new enterprises in which the combined companies engaged, and the expenses incurred in prosecuting the scheme in which the combination embarked. The case was decided, as Railroad Company v. Maine was, upon the special terms of the exemption. Mr. Justice Matthews, in delivering the opinion of the court, observed upon these peculiarities. He said: "The exemption is to cease when the profits of that particular company have reached the limit designated, and that limit is measured by a

ratable proportion fixed with reference to the capital to be subscribed to form that company, and no other." And the learned judge distinguished the case upon the circumstances from *Humphrey* v. *Peguis, supra,* in which the court expressly held that an exemption from taxation in the charter of one company would be vested in another corporation whose charter conferred upon it all the rights, powers and privileges granted by the charter of the former company.

These cases (Railroad Company *v.* Maine, and Chesapeake and Ohio Railway Co. *v.* Miller) recognize the rule of construction laid down in the preceding cases, that under a grant of immunities and privileges an exemption from taxation will pass. Indeed, the Supreme Court of the United States has uniformly adopted that doctrine as a cardinal rule of construction, and applied it in all cases except where a constitutional provision against exemption from taxation has interdicted it, or the contract of exemption has, in the altered condition assumed by the corporation become impossible of performance. In the case in hand neither of these obstacles has intervened. There was not, when the act of 1869 was passed, any constitutional provision prohibiting the legislature to make or renew a contract of exemption from taxation ; and the cost of the railroad, which is the basis of taxation under the act of 1865, can as readily be determined in the hands of its lessee as in the hands of that company.

The latest case on the subject in that court, decided as recently as March 1st, 1886, re-affirmed and applied the rule of construction propounded in the prior cases. The court decided that the right to have shares in its capital stock exempt from taxation was conferred upon a corporation by a statute granting to it "all the rights, powers and privileges," or granting it "all the powers and privileges" conferred upon another corporation named, if such corporation possessed by law such right of exemption. The Chief Justice, in delivering the opinion of the court, declared that this rule of construction was adopted in *Philadelphia, Wilmington and Baltimore R. R. Co.* v. *Maryland,* 10 *How.* 376–393, and was

expressly affirmed in Tomlinson v. Branch and Humphreys v. Peguis, and its correctness recognized in a number of cases which he cited, including Chesapeake and Ohio Railway Co. v. Miller.   He overruled a contrary decision of the Supreme Court of Tennessee in *Wilson* v. *Gaines*, 9 *Baxt.* 546, and declared that in both constitutions and laws the word "privilege" must be construed as embracing an exemption from taxation. *Tennessee* v. *Whitworth*, 117 *U. S.* 139.

The decisions of the Supreme Court of the United States, with respect to the interpretation and effect of contracts, furnish binding rules of construction in cases within the provision of the federal constitution prohibiting the passing of any law by the states impairing the obligation of contracts.   This court has also held that the words " franchises, privileges and immunities," in a statute creating a corporation by the consolidation of two existing corporations, were sufficient to grant to the new corporation an exemption from taxation contained in the charters of the other companies.   *Cook* v. *State*, 4 *Vroom* 474–477.

The lease between the two companies is dated December 10th, 1868.   The premises demised are described as "the railroad of the said party of the first part, extending from the Hudson river at Hoboken to the Delaware river at Phillipsburg, in the State of New Jersey ; and also all branch and other railroads owned, leased, rented or otherwise controlled by the said party of the first part, together with all the lands, real estate, water fronts, water rights, superstructures, piers, docks, wharves, landings, ferries, ferry rights, rights of way, railroads, railways, tracks, bridges, viaducts, culverts, fences, depots, stations, station-houses, water, water-pipes, water-stations and tanks, turn-tables, shops, buildings, structures, tools, machinery, fixtures, locomotives and other engines, cars, rolling stock and equipments, and also all other property and rights of every kind and character, real, personal and mixed, whatsoever and wheresoever situate, belonging to the said party of the first part, or to which the said party of the first part are wholly or in part in any manner entitled ; also all

and singular the franchises, immunities, rights, powers and privileges which have been or may be granted to or conferred upon, or which may be used or exercised by the said party of the first part—to have, hold, use, enjoy, possess and exercise, all and singular the property, things, franchises, immunities, rights, powers and privileges hereinbefore granted, leased and demised, with the hereditaments and appurtenances in anywise thereunto appertaining, unto the said party of the second part, their successors and assigns, from the thirty-first day of December, eighteen hundred and sixty-eight, for and during the full term of the continuance of the charter of the said party of the first part, and during the full term of the continuance of said charter, by virtue of any and all renewals thereof that may at any time hereafter be granted or made, as fully and beneficially, to all intents and purposes, as the said party of the first part might or could have, hold, use, enjoy, possess or exercise the same, had this indenture not been made."

Then follows an assignment of the lessor's choses in action, and the covenants of the parties respectively—covenants by the lessee to pay to the holders of the capital stock which the lessor had issued or might issue, under restrictions in the lease, of a named semi-annual dividend; to pay all taxes assessed by any authority having legal authority to levy and assess taxes; to complete the double track to Phillipsburg and the Boonton branch; to pay all the bonds, debts, obligations and liabilities for which the lessor was liable on January 1st, 1869—covenants by the lessor to continue and maintain its organization; to issue to the lessee bonds or other obligations or capital stock for such an amount and to such an extent as might be required " for completing the second track to Phillipsburg, and for the connection of the branch road from Denville, and for the construction of locomotives, machinery, cars and other equipments for said railroad, and for the construction of any other railroads which the party of the second part may, in the exercise of the rights conferred or that may be conferred by the charter of the party of the first part, or the supplement thereto, desire to construct, and for all other

things, work or works, which the said party of the second part may desire to do in the exercise of said right, the cost of which is properly chargeable to construction account."

A further covenant was contained in the lease that the lessee should repair, and at the expiration of the lease deliver, to the lessor, the peaceable possession of all the real property and railroads demised, and that might be constructed in pursuance of the lease; also all other property which might thereafter be acquired by the lessee, with the bonds, obligations or stock issued by the lessor, in at least as good order and condition as the same then were; and that the personal property demised should, upon the termination of the lease, be returned to the lessor in as good order as the same then was, or the value thereof, or the difference in the value if not returned in as good order as it then was, should be paid by the lessee, or property of like value and character to be returned to the lessor.

This summary of the contents of the lease is sufficient for present purposes.

The act of 1869, which validated the lease, after in its preamble reciting that the Morris and Essex Railroad Company had made and executed a certain lease and contract with the Delaware, Lackawanna and Western Railroad Company, by which lease and contract the property and franchises of the former company had been demised and leased to the latter company upon certain terms, conditions and rents in said lease and contracts set forth, and that it was deemed advisable and proper that the said lease and contract should be validated and confirmed, enacted as follows: "That the said lease and contract, and all the provisions, conditions, covenants and agreements therein contained, be and they are hereby validated and confirmed in all things, and said companies are hereby fully authorized and empowered respectively to carry out and perform the said lease according to the terms, conditions and stipulations thereof; and the said The Delaware, Lackawanna and Western Railroad Company is authorized and empowered to have, hold, use, enjoy, possess and exercise all and singular

the property, things, franchises, immunities, rights, powers and privileges, by said lease and contract granted, leased or demised to them, and to work said railroad and all its branches, to construct and use the branches and tracks in said lease and contract agreed to be built, in the manner and upon the conditions in all respects, and not otherwise, as authorized, directed and imposed in and by the act of incorporation of the said The Morris and Essex Railroad Company, and the supplements thereto, and generally to do all things by said lease and contract agreed by them to be done, as far as legal authority is necessary therefor; and it shall be lawful for the said corporations, and each of them, to make, execute, and deliver to each other any other contracts or legal instruments necessary or advisable the more effectually to carry out the general intent of said lease and contract;  *  *  *  and the said The Delaware, Lackawanna and Western Railroad Company is and is hereby declared liable to do and perform all acts and things which the said The Morris and Essex Railroad Company, as owners of the property and franchises demised by said lease and contract, would be bound in law to do and perform, had the said lease and contract not been made and confirmed; provided, that nothing contained in this act shall prevent the legislature from having the same control and authority over the property and franchises leased as aforesaid that they now have over the Morris and Essex Railroad Company."

The act is entitled "An act to validate and confirm a certain lease and contract, by which the Morris and Essex Railroad Company lease their road to the Delaware, Lackawanna and Western Railroad Company, a corporation of the State of Pennsylvania." It conferred upon the Delaware, Lackawanna and Western Railroad Company the capacity to accept the lease, and, besides validating and confirming the lease and all provisions, conditions, covenants and agreements therein contained, expressly authorized and empowered that company to have, hold, use, enjoy, possess and exercise "the property, things, franchises, immunities, rights, powers, privileges" by

the lease and contract granted, leased or demised to it. Under a rule of construction which we are not at liberty to disregard, this act must be construed as a grant, under the designation of "immunities and privileges," of the immunity from taxation expressed in the act of 1865. Nor is the right so granted impaired by the covenant in the lease for the payment of taxes. The covenant is *inter partes* for the indemnity of the lessor, and cannot be construed as the renunciation of the right granted to the lessor by the act of 1865.

The next question arising upon the record is the scope and operation of this contract of exemption as applicable to the two corporations respectively.

The original charter of the Morris and Essex Railroad Company authorized the construction of a railroad or lateral roads between Morristown and Newark. Branch roads to Boonton, Denville, Rockaway and Dover were authorized by the supplement of 1836. By the supplements of 1851 and 1855, the extension to Phillipsburg was authorized. By a supplement of 1857 the company was empowered to extend its railroad from Newark to the Hudson river, and to erect and maintain the necessary docks, wharves and piers in Hudson river, at the terminus of its road, for the transportation of passengers and freight to New York city, and also to have, own and hold, by lease, contract or deed of conveyance, all such land and real estate at the terminus of its road on said river as should or might be "necessary for docks, wharves and piers as aforesaid, and for passenger, car and store-houses, and for the convenient transaction of its business." This act required the company, in extending its road, to pass through Bergen hill for three thousand five hundred feet by means of a tunnel and not an open cut. By a supplement of 1864 the company was empowered to purchase from the Hoboken Land and Improvement Company the railroad the latter company had constructed from Newark to Hoboken, the route of which was the same as that on which the Morris and Essex had located the extension of its road under the act of 1857. The legislation above referred to empowered the com-

pany to construct a railroad between Hoboken and Phillips-burg, and under the powers thereby granted the main line of the company was constructed. By the first section of the act of March 23d, 1865, the company was authorized to construct what is called the Boonton branch. This branch deflects from the main line at Denville, six miles west of Morristown. The act authorized it to be returned into the main line at any point east of the First Mountain. In fact, this connection was made at the end of the tunnel, five miles east of Newark. The second section of this act contains the contract of exemption from taxation. So that when the act of 1865 became a law the company had the power to construct roads on the routes and between the termini of its railroads; that is, a railroad between Hoboken and Phillipsburg, with a connecting branch by way of Boonton.

Subsequent to the act of 1865, additional powers were granted to the company by other supplements to its charter. The contention is that works constructed and property acquired under such additional powers are not to be included in the cost of the company's railroad in the computation of the tax of one-half of one per cent. under the act of 1865, and that therefore the company is not protected from taxation on such works and property by the exemption contained in that act.

The legislation granting the additional powers is as follows : A supplement of April 6th, 1865, authorized the company to build a bridge over the Delaware river, at Phillipsburg, to enable it to connect its railroad with railroads in Pennsylvania. A supplement of March 5th, 1867, granted power to change the line of the company's railroad or widen it, and lay additional tracks and sidings, in order to straighten its railroad or reduce grades, with proviso that in changing the line of the railroad the new line should not be located at a greater distance than three miles from the old line. A supplement of March 28th, 1871, authorized the company to carry its Boonton branch through Bergen hill by means of an open cut or tunnel, and to so vary the main line of its railroad as to

connect it with the branch road either east or west, or both east and west, of Bergen hill, and to construct another railway viaduct across the Hackensack river. By another supplement, passed April 2d, 1873, the company was authorized to construct a branch or branch railroads—no one of which should exceed four miles in length—from the line of the Boonton branch, in the county of Passaic. None of these supplements authorized the company to engage in any new and distinct enterprise. The works authorized were mere adjuncts to the railroads the company was empowered to build when the act of 1865 took effect, the expenditures for which increased the cost of the company's railroad upon which the tax prescribed by that act was payable.

The contention that the cost of works constructed and property acquired under powers granted after the act of 1865 is not to be included in the cost of the road on which the tax by that act prescribed is laid is founded on a construction of the words "cost of said road" in section 15 of the original charter. In that section these words applied only to the company's railroad from Newark to Morristown, for the company then was not entitled to have any other road. The same words are repeated in the form of a proviso in the act of 1855, under which the road was extended to Hackettstown. The further expansion of the words "cost of said road" in the charter, so as to include the extension to Phillipsburg, is deduced by implication from the language of the third section of the act of 1865. But even with this enlargement of the words "cost of said road," the cost of the extension from Newark to Hoboken, and of the extensive works at that place, and the cost of the entire Boonton branch, would be excluded from "the cost of the road" on which the tax prescribed by the act of 1865 is payable; for neither of those extensions is in the line of the extension of the company's original road to Phillipsburg. In another respect this circumscribed interpretation of the words "the said road" would be detrimental to the interests of the state. The power of the state to take the company's railroad at cost is

reserved in the sixteenth section of the original charter as the privilege " of taking the said road." If these words do not expand so as to embrace extensions made under the supplements to the charter, the state would have the right to take only the road between Newark and Morristown, leaving in the company perpetually the extension from Newark to Hoboken, and the Boonton branch, with its western connections by way of Phillipsburg, and the Warren Railroad over which the company now transacts its through business.

This narrow construction of the words " the road " is untenable. In the proviso in the supplement of 1855 the legislature put a construction on the words " taxation on their road " in the original act, and declared these words to be applicable to continuations of the said road and branch roads " according to the true intent and meaning of the original act," and this construction was adopted by the company in accepting the act and building the branch authorized by it. Independent of this consideration, the cardinal rule for the construction of a charter and its supplements leads to the same result. A statute and its supplements are read as one law. A grant of an additional franchise to an existing corporation by the jurisdiction which created it does not create a new corporation. Such a grant simply adds to or modifies its previously existing powers. The corporation to which, from time to time, additional franchises are granted is still the same corporate body—the same legal entity, under one organization and one management, and its franchises are a unit. The " road " in the taxing section on which the annual tax is to be paid, is the road the company was authorized and empowered, from time to time, to own and operate, comprising the extensions and branches thereof, and including its appendages.

In *State Treasurer* v. *S. & E. R. R. Co.*, 4 *Dutcher* 21, 27, it was held that the word " road " in a charter requiring a railroad company to pay an annual tax of one-half of one per cent. " upon the cost of said road " included the road and its appendages, in which were included bridges, viaducts, wharves,

piers, depots and depot grounds, machine shops and other similar erections which are essential either to its completion or to its advantageous and convenient operation. Such has uniformly been the practical construction of charters containing provisions of this character.

But if the restricted construction contended for with respect to the property on the cost of which the tax is to be computed should be adopted, such construction would not affect the operation and effect of the clause of exemption. The contract embodied in the act of 1865 is, on the one hand, a contract by the company to pay an annual tax of one-half of one per cent. upon the cost of the road, and, on the other hand, a contract by the state that that tax " shall be in lieu and satisfaction of all other taxation or imposition whatsoever by or under the authority of this state or any law thereof." The contract is one by way of commutation of taxes. Mr. Justice Cooley, writing on this subject, says : " When a certain sum is specified, or a certain percentage upon valuation, or upon receipts or acquisitions in any form, this is in the nature of a commutation of taxes, the state agreeing that the sum named is, under the circumstances, a fair equivalent for what the customary taxes would be, or the fair proportion which the person bargained with ought to pay." *Cooley on Taxation* (2d ed.) 69. On a subsequent page in the same book (page 80) this learned jurist says.: " There is no room for any question that when the state has stipulated by contract to give exemption from taxation, or has commuted the uncertain taxes for a definite and fixed sum or sums, and afterwards undertakes to tax, in the same manner as it taxes other subjects, the persons, corporations or property which were the subject of the exemption or commutation, the obligation of the contract is impaired."

These principles have been repeatedly declared and acted upon by our own courts. In *State* v. *Berry*, 2 *Harr.* 80, the charter of the company required the payment to the state of a tax of one-half of one per cent. on its capital stock paid in, and then enacted " that no further or other tax or impost shall

be levied or assessed upon said company." Township and
county taxes were laid upon the company's property. Mr.
Justice Dayton, in pronouncing the judgment of the court set-
ting aside the taxes, speaking of the words "that no other tax
or impost shall be levied or assessed," said : " This does not
exempt the franchises or privileges of the company merely
from taxation, but it exempts the company generally from
all other taxation to which their property, in common with
the property of individuals, would have been subject without
such special exemption." This construction of the charter
then in question was affirmed by the decision of this court in
*Gardner* v. *State*, 1 *Zab.* 557.   In *Camden and Amboy R. R.
Co.* v. *Hillegas*, 3 *Harr.* 11, the charter provided for the pay-
ment to the state treasurer of ten cents for each passenger and
fifteen cents for each ton of merchandise transported on the
road, and declared "that no other tax or impost shall be
levied or assessed upon the company." It will be observed
that here the tax to be paid was simply a franchise tax, to be
determined upon the *quantum* of the company's business.
The court nevertheless held that the exemption applied to all
taxes of whatever kind, whether upon property or anything
else, and whether for state, county or township purposes.
This ruling was re-affirmed in *State* v. *Mansfield*, 3 *Zab.* 510,
and again by this court in *State* v. *Hancock*, 6 *Vroom* 537, as
available for the protection from taxation of all property
suitable and proper for carrying into execution the powers
granted to the company. In *State* v. *Brannin*, 3 *Zab.* 484,
the exemption was applied to taxation upon the capital stock
of the company in the hands of its stockholders. In *State*
v. *Bentley*, 3 *Zab.* 532, and *McGavisk* v. *State*, 5 *Vroom* 509,
the court, in construing section 15 of the charter of the Mor-
ris and Essex Railroad Company and the supplement of
1865, held that each of these provisions exempted the prop-
erty of the company, and also its stock in the hands of its
stockholders from taxation, although the contingency on which
the tax prescribed was to be paid by the company had not
happened.   The decisions of the federal Supreme Court are

of the same import. In a series of cases, that tribunal, which makes the law on this subject, has decided that where a corporation has a contract for the commutation of taxes on any consideration whatever, a statute levying a tax of a greater amount, or upon a different principle, than is expressed in the contract, either upon its property or business or upon its stock, is in conflict with the federal constitution. *Gordon* v. *Appeal Court*, 3 *How.* 133; *Dodge* v. *Woolsey*, 18 *Id.* 331; *Wilmington R. R. Co.* v. *Reade*, 13 *Wall.* 264; *Farrington* v. *Tennessee*, 95 *U. S.* 679, and cases cited in *Cooley on Taxation* 69, *note*. The terms in which the contract in this instance is expressed—that the tax on the cost of the road shall be "in lieu and satisfaction of all other taxation or imposition whatsoever by or under the authority of this state or any law thereof"—are so comprehensive and explicit as not to admit of qualification or limitation by construction. And so long as the federal courts continue to uphold the power of the legislature to make contracts with respect to the exercise of the sovereign power of taxation, the courts must give effect to the language in which the legislature has made the contract.

Contracts of this description are intrinsically prospective. They are usually inserted in the charter which creates the corporation, and have relation to property and rights which may be acquired in the future under such powers as the corporation may possess and apply to taxation from time to time, as taxes are assessed. They are universally regarded as contracts with the corporation personally. The Morris and Essex Railroad Company was constituted a corporation by the first section of its charter. All the legislative provisions that follow, whether in the charter or the supplements to it, are either grants of power and franchises, or restrictions upon power and franchises previously granted, or prescriptions of the manner in which the corporation so formed shall exercise its franchises and perform its functions. Mr. Kyd defines a corporation as a body having perpetual succession under an artificial form and vested with the capacity of exercising the powers conferred upon it either at the time of its

creation or at any subsequent period of its existence. 1 *Kyd on Corp.* 13; 1 *Morewetz on Corp.*, § 1; *Ang. & A. on Corp.*, §§ 2, 4. In the grant of additional franchises there is no new creation of a corporate body. The legislature may make an additional grant of franchises or take away some of the franchises previously conferred, but the ideal artificial person originally created ·will remain with increased or diminished powers until it ⌐pires by its own limitation or is extinguished by legislative authority.

Nor is the operation of the act of 1865 controlled or qualified by the fact that the supplements to the charter after the date of that act are repealable. In the opinion of the Supreme Court of this state, and of this court in *State, M. & E. R. R. Co., pros.*, v. *Commissioner*, 8 *Vroom* 228, 236; 9 *Id.* 472, 480, it was held that the supplement to a repealable charter must partake of the character of the charter to which it is a supplement, and hence be of itself repealable. But a different view was adopted in the Supreme Court of the United States. The learned judge who delivered the opinion in that court conceded that the charter of the company and the supplement of 1836 were repealable, but nevertheless held the third section of the act of 1865 to be effective to create a contract with the company on the subject of taxation. *New Jersey* v. *Yard*, 95 *U. S.* 104, 113. The principle of that decision is that the legislature may grant to a corporation two classes of rights and franchises, those over which it retains control to modify or withdraw by alteration or repeal, and those which are embodied in a contract and hence incapable of alteration or repeal, and that under such circumstances the legislative control by alteration or repeal is exercisable only upon the charter rights and privileges over which such power is retained. Hence, though the charter and supplements may be altered or repealed, the contract on the subject of taxation will stand and be efficient with respect to such rights and franchises as are allowed to remain in the company. The principle applies as well to supplements after the act of 1865 as to those legislative grants of franchises which preceded that

act;. for the whole of this legislation with respect to its bind-
ing force is of the same character, and the contract in the act
of 1865 that the state will accept from the company a per-
centage on the cost of the road in lieu and satisfaction of all
other taxation, applies as well to franchises and property
acquired after the act of 1865 as to those previously granted.
We cannot conclude otherwise without coming in conflict with
the decision of the federal court.

The *status* of the Delaware and Lackawanna Railroad
Company is different in some respects, and the immunity from
taxation granted to it is not identical in every feature with
that possessed by the other companies. It is a corporation of
another state. The legislature may grant to a foreign cor-
poration power to exercise its franchises or independent powers
in the nature of corporate franchises within the state, without
making it a domestic corporation. *Railroad Co.* v. *Harris,*
12 *Wall.* 65; *Railway Co.* v. *Whiton,* 13 *Id.* 271, 284; *State,
Lehigh Valley R. R. Co., pros.,* v. *Mutchler,* 13 *Vroom* 461;
*In re Townsend,* 39 *N. Y.* 171. In such cases the foreign
corporation will take under legislative sanction those rights
only which are within the expressed terms of the grant.

The Morris and Essex Railroad Company is a corporation
of this state. The railroad it was authorized to build and
operate was intended for local accommodation. The im-
munity from taxation it possessed was granted to it as a
corporation, and was personal to it in its corporal capacity.
It extended to all properties it might own suitable and proper
for carrying into execution the powers it possessed, and ap-
plied to its stockholders as well as to the company's property
and franchises. The Delaware, Lackawanna and Western
Railroad Company is a foreign corporation, whose operations
and business are chiefly in other states. The act of 1869
evinces no purpose to create it a corporation of this state or to
confer upon it an immunity from taxation co-extensive with its
corporate powers. Immunity from taxation is granted to it,
not as a corporation, but as lessee, and with respect to the use,
possession and enjoyment of the property, things, franchises,

rights and powers "by said lease and contract leased and demised" to it, and is therefore limited to such rights and property as it took and holds as lessee, and upon a construction of the lease *strictissimi juris*.

The lease is aptly styled in the act of 1869 a lease and contract, and it partakes of the character of both—a lease so far as it is a grant and demise of property and franchises, and a contract with respect to the covenants of the parties *inter sese*. The act of 1869 validated and confirmed the lease as a grant and demise of franchises and property, and validated the covenants of the parties *inter sese*.

The subject matter of the demise, as expressed in the lease, is the company's railroads and appendages, together with the franchises, immunities, rights, powers and privileges which had been or might be granted to or conferred upon the lessor, and also its personal property, consisting of fixtures, rolling stock and equipment, and all other property, real, personal or mixed, belonging to the lessor. The grant and demise apply to such franchises as the state had conferred, or might thereafter confer, *nominatim* upon the Morris and Essex Railroad Company, but no further. This is the grant and demise validated and confirmed by the act of 1869. At that time the Morris and Essex Railroad Company was possessed of the franchises necessary for the construction and operation of its road between Phillipsburg and Hoboken, and the Boonton branch, with power to build a bridge over the Delaware river at Phillipsburg, and to construct docks, wharves and piers at Hoboken, and to acquire at that point such lands and real estate as might be necessary for those structures and for passenger, car and store-houses and for the convenient transaction of its business. The supplements after that date authorized changes so as to carry the railroad through Bergen hill by an open cut instead of a tunnel, and the construction of short branches from the Boonton branch in Passaic county, works that were adjuncts to the railroad the company was previously authorized to construct and operate. Under the terms of the act of 1869, the lessee company is entitled to the use and en-

joyment, under legislative sanction, of all such rights and franchises as have been so conferred upon the Morris and Essex Railroad Company, and upon those franchises and the property acquired under them immunity from taxation was granted. The language of the act of 1869 will allow no other construction. But with respect to powers granted to railroad corporations by general laws, such as the acts of 1877 and 1878 (*Pamph L.* 1877, *p.* 48 ; *Pamph. L.* 1878, *p.* 179), property acquired under those acts—not being property taken and held under the lease—is not within the validating act, and consequently immunity from taxation thereon is not granted by that act.

A like limitation must be applied to immunity from taxation upon the rolling stock, equipment and other property with which the road is operated and its business is conducted. Such immunity will extend only to property of that description which the Delaware, Lackawanna and Western Railroad Company has taken and holds as lessee. The covenant of a landlord in the lease of a farm, stocked and fitted out, to pay the taxes on the premises demised will not include utensils and implements brought on it by the tenant, though they may be suitable and proper and even indispensable for the profitable cultivation of the premises. The state's grant cannot have a broader construction. Rolling stock, equipment and other property used by the company in operating the railroad and in its business connected therewith, not taken and held by it under the lease and in the capacity of the lessee, are not within the grant of immunity from taxation.

In stating the contract on the subject of taxation, I have made no mention of the means by which the cost of the road should be ascertained. Neither the charter nor the act of 1865 provides that the tax shall be paid on a reported cost of the road by the company. In fact, the cost of roads in charters like the charter of this company has been ascertained for the purpose of taxation by reports made under section 51 of the general act. *Rev., p.* 916. Such a provision, even if inserted in the charter, would not conclude the state. The

state may alter modes of procedure which do not affect the substantial rights of parties under the contract, and a change in this respect would not impair the obligation of the contract. *Bailey* v. *Maguire*, 22 *Wall.* 215; *Sinking Fund Cases*, 99 *U. S.* 700; *United Companies* v. *Weldon*, 18 *Vroom* 59. The matter is wholly within legislative discretion.

The tax required to be paid upon the cost of the road is a tax such as the commissioners of railroad taxation may assess, and it is possible that the act of 1884 and the supplement of 1885 (*Pamph. L., p.* 401), are adequate to enable the commissioners to ascertain and lay a tax of this description. No application has been made to refer the assessment back to the commissioners for correction. Nor does it appear in the depositions that the assessment has been made upon any property for which either of these companies is taxable. The depositions were taken under an arrangement between counsel for the single purpose of obtaining a construction of the several acts of the legislature which have been considered. Nothing appears on the record except an assessment of taxes against the Morris and Essex Railroad Company on property used for railroad purposes. On this record the judgment should be affirmed. The record will be retained to allow the attorney-general to make any application on the subject that he thinks advisable.

DIXON, J. (dissenting). I concur in the decision of this court that the statute approved March 23d, 1865 (*Pamph. L., p.* 555), and the assent thereto filed April 24th, 1865, formed a contract between New Jersey and the Morris and Essex Railroad Company, the obligation of which no state law could impair, and that by force of the lease made December 10th, 1868, and the statute approved February 9th, 1869 (*Pamph. L., p.* 28), to ratify and confirm said lease, all the rights of the Morris and Essex Railroad Company, under its contract with New Jersey, passed to the Delaware, Lackawanna and Western Railroad Company.

The next inquiry presented relates to the scope of the contract. Its terms are that a certain tax to be paid by the company "shall be in lieu and satisfaction of all other taxation or imposition whatsoever, by or under the authority of this state or any law thereof;" and the exact question to be decided is, What taxation or imposition is to be prevented or satisfied by payment of the stipulated tax?

In my judgment, the taxation or imposition intended was such as otherwise might have been levied upon the company as it then existed, endowed with the powers and capacities which it then possessed.

The contract cannot reasonably be limited to the property, stock and business which the company then had, because under that rule such contracts in original charters, where they are commonly found, would be meaningless, for of course there would be no stock, business or property to which they could apply.

On the other hand, the contract should not be extended to powers and capacities conferred after the contract, for reasons which to me seem cogent. It is not claimed that by the statute of 1865 the state became bound to make any further grant to the Morris and Essex Railroad Company or its assigns. Undoubtedly the state was left at perfect liberty to do as it might choose in that respect. Hence, if we hold that the contract of 1865 embraced the powers and capacities that might afterwards be delegated to the company, we must hold that, although the state was under no obligation to bestow further powers or capacities, yet it had bound itself that, if any such were bestowed, one of the terms of bestowal should be to relieve the company from taxation in their exercise. An obligation of this nature, between parties situated towards each other as were the state and the company, would be most remarkable. The company, if it expected to ask further grants from the state (and only on the hypothesis that it did can these grants be supposed to have been within its contemplation in making this contract), would scarcely desire to set up a barrier which might prevent the state from conceding

the favors; and the legislature of 1865 must have foreseen that any subsequent legislature having favors to give would itself define the conditions of its gift. A contract between the company and the legislature of 1865 that if any subsequent legislature should desire to give anything to the company, it should be compelled to give more than it was willing to give, would manifestly be nugatory, if not absurd, and its existence is not to be credited. Whether the company is exempted from the prerogative of taxation in the exercise of powers and capacities granted to it after the contract of 1865, should be ascertained, not by the terms of that contract, but by the just interpretation of the laws under which the grants were made. Suppose those laws expressly declared that the company, in the exercise of all powers under them, should be subject to taxation at legislative discretion, would any one pretend that the company might accept the benefit and repudiate the burden? If not, it must be because each legislature can fix the terms of its own grant, and the company must take the grant with the terms, or else take nothing.

We come then to consider the laws affecting the company passed after the contract; and of these, as of all laws creating corporate privileges, it must be remembered that by no implication can they derogate from the sovereign power to tax; express terms are necessary for that purpose. The only enactment having any appearance of contracting with the company for exemption from taxes is that approved March 5th, 1867. *Pamph. L.*, *p.* 144. This statute authorizes the company to increase its capital stock to any amount not exceeding $10,000,000, to straighten its railroad, reduce the grades thereof and make the necessary sidings and facilities for railroad purposes, and then adds section 3, as follows:

"And be it enacted, that no tax by or under the authority of this state shall be imposed upon any property purchased, held or used by said company for the purposes of their charter or any of the supplements thereto, except the tax of one-half of one per centum on the cost of their road, which by the said charter and the supplement thereto, approved on the

twenty-third day of March, eighteen hundred and sixty-five, was required to be paid by said company in lieu of all other taxes, any act to the contrary notwithstanding."

The question is, Was this a contract or an act of legislation only? I deem it the latter for the following reasons:

First. There is always a strong presumption that a statute is an act of legislation and not a contract.

Second. This presumption is intensified in the present case by the fact that when contracting with the Morris and Essex Railroad Company by the statute of 1865, the state had carefully cast its agreement into the form of a contract, by making a written offer on one side and requiring a written acceptance on the other, while the statute of 1867 retains the form of a law merely.

Third. There was no consideration to support any legal obligation on the part of the state. There was no dispute pending; no right was surrendered by the company; no duty was imposed by the state; the statute of 1867 is simply an enlargement of the company's privileges, of which it might or might not avail itself, at its pleasure.

Fourth. This provision in the statute of 1867, regarded as legislation only, could have due effect in saving the company from all taxes under existing laws, whether the taxes were such as the contract of 1865 precluded or not; hence, it need not be adjudged a contract in order to make it operative.

I find, therefore, no contract between the state and the Morris and Essex Railroad Company which exempts from the taxing power that company or its assigns, in the exercise of any power or capacity granted after the act of March 23d, 1865, and whatever property that company or the Delaware, Lackawanna and Western Railroad Company, as its lessee, possessed in 1884, which had been acquired by the exercise of powers or capacities conferred after March 23d, 1865, should be deemed subject to taxation under the Railroad Taxation act of 1884.

So far as the judgment of the Supreme Court holds to the contrary, it should be reversed.

*For affirmance*—THE CHANCELLOR, DEPUE, PARKER, REED, SCUDDER, BROWN, COLE.    7.

*For reversal*—DIXON, CLEMENT, MCGREGOR.    3.